**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HIGHMARK INC. AND<br>KEYSTONE HEALTH PLAN WEST,<br>INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UPMC D/B/A UNIVERSITY OF<br>PITTSBURGH MEDICAL CENTER,<br>UPMC PRESBYTERIAN SHADYSIDE,<br>MAGEE-WOMENS HOSPITAL OF<br>UPMC, UPMC NORTHWEST, UPMC ST.<br>MARGARET, UPMC PASSAVANT,<br>UPMC HORIZON F/K/A HORIZON<br>HOSPITAL SYSTEM, INC., UPMC<br>BEDFORD D/B/A UPMC BEDFORD<br>MEMORIAL, AND UPMC<br>MCKEESPORT,<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. _____<br><br>**DEMAND FOR JURY TRIAL**<br><br>**ELECTRONICALLY FILED** |

## SUMMARY OF CLAIMS

1.       Plaintiffs Highmark Inc. and Keystone Health Plan West, Inc. (collectively, "Highmark") bring this action to halt a campaign of misinformation by defendant UPMC Health System and its affiliated hospitals (sometimes referred to collectively here as "UPMC").  The misinformation campaign is designed to panic employers and health care consumers into thinking that they have to sever all ties with Highmark immediately because the Highmark/UPMC relationship will be totally and permanently severed as of June 30, 2012.  **In fact, even if UPMC ultimately implements the threatened changes to the Highmark/UPMC relationship, there would be no impact to Highmark plan members until at least July 1,**

**2013, and therefore no employer or health care consumer need make any decisions regarding the potential impacts of those changes for at least another year.**

2.      UPMC's malicious campaign is largely designed to retaliate against Highmark for daring to help keep alive the only alternative large health care system in the Pittsburgh metropolitan area that competes with UPMC, West Penn Allegheny Health System ("West Penn").  UPMC and Highmark (or their predecessors) have continued to do business together for decades, even as UPMC acquired more and more of the hospitals serving Western Pennsylvania, and even after UPMC decided to become a direct competitor of Highmark by offering its own healthcare insurance plans, in the late 1990s.  Now, however, UPMC seeks to punish Highmark for having the temerity to help preserve West Penn (which employs more than 13,000 people) as an alternative healthcare provider to UPMC to allow Western Pennsylvania consumers a choice of providers as well as access to additional providers.

3.      UPMC's misinformation plan is aggressive and comprehensive, including print media, radio, a dedicated website and direct solicitations of employers and consumers.  It is also brazen; UPMC makes no attempt to hide that Highmark's decision to aid cash-strapped West Penn motivated its actions.  If Highmark does not aid it, West Penn will surely fail, leaving UPMC as the only large provider of hospital services in Western Pennsylvania.

4.      UPMC's conscious attempt to mislead and confuse consumers constitutes false and misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a), and also breaches multiple agreements with Highmark that expressly prohibit efforts to drive Highmark's customers away.

5.      UPMC's unlawful campaign started in April 2011, with targeted attacks on insured and self-insured customers of Highmark.  It broadened to include targeted attacks on

Highmark members, end-user consumers of UPMC's services, in June 2011, with the launch of a false and misleading advertising campaign called "Keep Your Doctor.  Check Your Plan."  This multifaceted campaign includes (1) the launch of the website www.keepyourdoc.com, (2) full page advertisements that appeared and continue to appear in the *Pittsburgh-Post Gazette, Pittsburgh Tribune-Review* and other area newspapers, (3) radio advertisements, and (4) directives issued to the medical staff at UPMC-affiliated hospitals to distribute targeted solicitations to Highmark plan members.

6.      UPMC's campaign is designed to scare Highmark plan members into believing that their relationships with their current UPMC doctors have already been interrupted or are in imminent jeopardy, and that they must switch insurance carriers as soon as possible or risk losing access to such doctors.  The campaign expressly directs Highmark members to petition their employers to switch to another insurance carrier before the next open enrollment period in the fall of 2011.  In fact, Highmark members will not experience any change in coverage with respect to UPMC physicians and hospitals until **at the earliest July 1, 2013**, and even then it will be far less than the UPMC campaign necessarily conveys.  The contracts between the parties contain "run-out" clauses, pursuant to which UPMC must accept agreed-upon rates for services rendered to Highmark's members through June 30, 2013 with no balance billing of Highmark members, other than applicable cost-sharing provided for in members' benefit plans (*i.e.,* co-insurance, co-pays and deductibles).  In other words, until at least July 1, 2013, UPMC cannot bill or otherwise attempt to collect from Highmark members amounts for services that are over and above the rates that Highmark and UPMC have agreed upon in the relevant contracts.

7.      All facets of the Keep Your Doctor campaign have a singular purpose—to smear Highmark and tarnish its reputation, and to lure away its current plan members and encourage

them to enroll with UPMC Health Plan or other insurance providers.  This conduct is in direct violation of Highmark's contracts with the Hospitals.  The false and misleading nature of the campaign also violates the Lanham Act, 15 U.S.C. § 1125(a).

## JURISDICTION AND VENUE

8.       Highmark brings this action pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and state law, to prevent and restrain UPMC's breach of contract and other violations of the law and to recover damages, the costs of this suit, and reasonable attorneys' fees.

9.       This Court has jurisdiction over the federal claims alleged under 28 U.S.C. § 1331, and over the state law claims alleged under 28 U.S.C. § 1367(a).

10.       Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because during the relevant period, UPMC resided, transacted business, was found, or had agents in this district, and/or because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

## THE PARTIES

11.       Plaintiff Highmark Inc. is a non-profit corporation organized and existing under the laws of the Pennsylvania with a principal place of business at 120 Fifth Avenue, Pittsburgh, PA 15222-3099.

12.       Plaintiff Keystone Health Plan West, Inc. is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 120 Fifth Avenue, Pittsburgh, PA 15222-3099.

13.       Defendant UPMC d/b/a University of Pittsburgh Medical Center a/k/a UPMC Health System ("UPMC Health System") is a non-profit corporation organized and existing

under the laws of Pennsylvania with a principal place of business at 200 Lothrop St., Pittsburgh, PA 15213-2582.  UPMC Health System is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.  Together with its wholly-owned and/or controlled hospitals, it is by an overwhelming margin the largest provider of health care services in Western Pennsylvania.

14.     Defendant UPMC Presbyterian Shadyside ("Presbyterian") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at DeSoto at O'Hara Streets, Pittsburgh, PA 15213.   Presbyterian is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

15.     Defendant Magee-Womens Hospital of UPMC ("Magee-Womens Hospital") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 300 Halket St., Pittsburgh PA 15213.  Magee-Womens Hospital is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

16.     Defendant UPMC Northwest ("Northwest") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 100 Fairfield Dr., Seneca, PA 16346.  Northwest is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

17.     Defendant UPMC St. Margaret ("St. Margaret") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 815 Freeport Rd., Pittsburgh, PA 15215.   St. Margaret is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

18.     Defendant UPMC Passavant ("Passavant") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 9100 Babcock Blvd., Pittsburgh, PA 15237.   Passavant is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

19.     Defendant UPMC Horizon f/k/a Horizon Hospital System, Inc. ("Horizon") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 110 North Main St., Greenville, PA 16125.   Horizon is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

20.     Defendant UPMC Bedford d/b/a UPMC Bedford Memorial ("Bedford") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 10455 Lincoln Highway, Everett, PA 15537.   Bedford is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

21.     Defendant UPMC McKeesport ("McKeesport") is a non-profit corporation organized and existing under the laws of Pennsylvania with a principal place of business at 1500 5th Ave. McKeesport, PA 15132.  McKeesport is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

22.     Non-defendant hospital Hamot Medical Center of the City of Erie, Pennsylvania d/b/a Hamot Medical Center a/k/a UPMC Hamot ("Hamot") is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 201 State St. Erie, PA 16550.  Hamot is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

23.     Non-defendant hospital UPMC Mercy f/k/a The Mercy Hospital of Pittsburgh ("Mercy") is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 1400 Locust St., Pittsburgh, PA 15219.  Mercy is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

24.     Non-defendant hospital Children's Hospital of Pittsburgh of the UPMC Health System ("Children's Hospital") is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at One Children's Hospital Drive, 4401 Penn Avenue, Pittsburgh, PA 15124.  Children's Hospital is currently recognized by the Internal Revenue Service as a tax-exempt public charity under Section 501(c)(3) of the Internal Revenue

Code of 1986, as amended, as well as a tax-exempt entity by the Commonwealth of Pennsylvania.

25.     Presbyterian, Magee-Womens Hospital, Northwest, St. Margaret, Passavant, Horizon, Bedford, McKeesport, Hamot, Mercy, and Children's Hospital shall be collectively referred to as the "Hospitals."  The Hospitals and UPMC Health System shall be collectively referred to as "UPMC."

## **BACKGROUND**

26.     Highmark Inc., based in Pittsburgh, PA, is a non-profit health insurer that offers and administers health insurance benefit plans in Pennsylvania.  Highmark is an independent licensee of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans.  Highmark and its affiliates serve 4.8 million health plan members in Pennsylvania and West Virginia.  Highmark employs more than 19,500 people nationally, including approximately 10,500 in Pennsylvania.  Highmark provides health, dental, vision, and supplemental health products and services to 32.6 million customers.  Highmark provides insurance services for Commonwealth of Pennsylvania employees and administers Pennsylvania's Children's Health Insurance Program.  Through its government business, Highmark processes claims for millions of Medicare members and provides dental coverage for military families as well as health, dental and vision coverage for federal employees.

27.     Highmark's annual economic impact in Pennsylvania exceeds $2.5 billion. Highmark is a major contributor to the economic vitality of the Commonwealth as well as to the individual counties it serves.  Households, businesses, government, and other organizations throughout Pennsylvania are recipients of substantial Highmark-related revenue.  The company paid nearly $260 million in federal, state, and local taxes, including property taxes, in 2010.

Highmark employees logged 111,000 hours of volunteer service, valued at $2.19 million, and raised more than $2.74 million for communities in western and central Pennsylvania through Highmark's United Way campaign.

28.     Highmark offers a variety of indemnity and managed care health insurance products, along with consumer-driven health plans and Medicare supplemental products, in its core service areas:  Western Pennsylvania, Central Pennsylvania, and the Lehigh Valley.

29.     Keystone Health Plan West, Inc. ("Keystone") is a subsidiary of Highmark Inc.  It is a health maintenance organization serving Western Pennsylvania.   Its products include Keystone Blue and Medicare Advantage products for eligible seniors.   (Highmark Inc. and Keystone shall be collectively referred to as "Highmark").

30.     UPMC Health System, also based in Pittsburgh, PA, is a $9 billion global health enterprise that owns and operates more than 20 hospitals, including the Hospitals, 400 doctors' offices and outpatient sites, a health insurance services division, and international and commercial services.  Through numerous acquisitions over the past 20 years, it has become by far the largest provider network in Western Pennsylvania.  Indeed, UPMC has market share in excess of 55% in Allegheny County.

31.     The Hospitals provide a wide range of health care services to people who reside in and outside of Pennsylvania, including at least some services to residents of nearby communities in West Virginia, New York and Ohio.

32.     UPMC Health System is the sole corporate member of the Hospitals, and, as such, UPMC Health System has a clear financial stake in the Hospitals' contractual relationships with Highmark.

33.     Because all of the Hospitals provide health care services and share the same corporate member, all of the Hospitals share a unity of interest and purpose.  UPMC Health System likewise shares a unity of interest and purpose with the Hospitals.

34.     UPMC Health System also operates an insurance health plan, UPMC Health Plan. Launched in 1998, UPMC Health Plan offers traditional HMO (Health Maintenance Organization), PPO (Preferred Provider Organization) and EPO (Exclusive Provider Organization) plans, among other products and services.

35.     UPMC Health Plan serves approximately 1.4 million members in and around Western Pennsylvania.  It has a network of more than 125 hospitals and more than 11,500 physicians.  UPMC Health Plan services more than 6,000 different employers.

**The Hospitals' Contracts**

36.     Highmark has binding contracts with each of the Hospitals and with other UPMC-affiliated providers and physicians pursuant to which Highmark's health plan members receive services from these providers at certain agreed-upon rates.  Pursuant to these contracts, the Hospitals and UPMC physicians are deemed "in-network" providers for Highmark plan members, and the members are entitled to discounted rates for services they receive from these providers with no balance billing other than applicable cost sharing under the member's benefit plan.

37.     Nine of the eleven Hospitals have two types of commercial hospital contracts with Highmark: Hospital Agreements and Managed Care Hospital Agreements.  Hospital Agreements, sometimes referred to as "indemnity agreements," relate to traditional "indemnity" health insurance plans, which allow members to obtain covered care from any providers of their choosing.  Managed Care Hospital Agreements relate to more restrictive health insurance plans,

such as Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs), where members may obtain care from a specified network of hospitals and physicians with lower member cost sharing.  The other two non-defendant Hospitals (Mercy and Hamot) have Facility Agreements with Highmark, which likewise establish certain rates for services provided to Highmark members covered under commercial indemnity and managed care products.  The relevant Hospital Agreements, Managed Care Hospital Agreements and Facility Agreements shall be referred to collectively as the "Contracts."

38.     While the specific wording sometimes varies slightly, each of Highmark's Contracts with the Hospitals contains a similar non-solicitation provision that prohibits each hospital from soliciting or attempting to influence any Highmark plan member (i) to disenroll from coverage with Highmark, and/or (ii) to participate in or subscribe to another health plan. Solicitation in the form of "targeted" advertising aimed at Highmark subscribers is expressly forbidden (the "Non-Solicitation Clauses").  Simply put, each of the Hospitals agreed not to try to lure Highmark's customers away from it, directly or indirectly, much less by false and misleading means.

39.     The Non-Solicitation Clauses remain in effect today, and, by their terms, will continue in effect for one year after termination of the Contracts.

40.     For eight of the eleven Hospitals (Presbyterian, Magee-Womens Hospital, Northwest, St. Margaret, Passavant, Horizon, Bedford, McKeesport), the current term of their Contracts runs through June 30, 2012.  The current terms for the other three non-defendant Hospitals' Contracts (Hamot, Mercy, and Children's Hospital) run through June 30, 2013, June 30, 2015 and June 30, 2022, respectively.

41.     Each of the Hospital's Contracts (except for Children's Hospital) provides that at the end of the current term, the contract will automatically renew from year to year unless a party provides written notice of non-renewal.  In the event a Contract is terminated by non-renewal, the Hospitals are obligated to continue to provide services to Highmark members for another year and services rendered to Highmark members are subject to agreed-upon rates for that year with no balance billing to the member (other than applicable cost sharing).  This provision is sometimes known as the "run-out clause."

42.     On April 14, 2011, UPMC Health System and the eight named defendant Hospitals notified Highmark that UPMC would not be renewing those Hospitals' Contacts and that they would terminate by their terms on June 30, 2012.  Those eight hospitals are Presbyterian, Magee-Womens Hospital, Northwest, St. Margaret, Passavant, Horizon, Bedford and McKeesport.  Pursuant to the run-out clauses, if those eight contracts do in fact terminate on June 30, 2012, UPMC has agreed to be reimbursed at agreed upon rates for services rendered to Highmark's members through June 30, 2013 with no balance billing of Highmark members (other than applicable cost sharing).

**<u>Employers' Selection of Health Plans</u>**

43.     Because most consumers receive health insurance through their employer, Highmark and other health insurers market a broad range of products to employers, from open-ended indemnity-type plans to more restrictive plans such as HMOs and PPOs.  Employers typically select the insurer that will provide coverage and the plans they will offer to their employees from among the chosen insurer's available options.

44.     Most employers provide only a limited window of time each year for their employees to choose their health coverage for the next year.  This window, called the "open

enrollment period," begins for many of Highmark's current customers in September/October/November 2011 for the coverage year beginning January 1, 2012. Once the open enrollment period ends, all elections made by the employees will be binding for the year beginning January 1, 2012. In other words, employees who enroll in a health plan effective January 1, 2012 will not be permitted to switch plans until January 1, 2013.

45.     Highmark competes with other insurance plans for employers to select it as a health insurance option for their employees. Since at least 1998, UPMC has done the same, through UPMC Health Plan, its own health insurance affiliate.

<strong><u>UPMC'S UNLAWFUL ACTIVITIES</u></strong>

**<u>UPMC's Targeted Solicitations of Employers Violates the Non-Solicitation Clauses</u>**

46.     Since at least mid-April 2011, in retaliation for Highmark's expressed interest in maintaining West Penn as a viable provider of healthcare services and competitor to UPMC, UPMC has been targeting Highmark plan members and their employers, using false and misleading scare tactics to coerce them to end their relationship with Highmark, and to switch to other insurance carriers.

47.     For example, Gregory K. Peaslee, Senior Vice President & Chief Human Resources and Administrative Services Officer for UPMC Health System sent an email to Pittsburgh-area employers on or around April 18, 2011. In it he stated UPMC's displeasure at "Highmark's decision to infuse subscriber money into West Penn Allegheny Health System". He then went on to intimidate the employers, falsely stating that:

> "As a result access to UPMC physicians and hospitals will only be available through UPMC Health Plan and a number of prestigious national insurers after our current contract with Highmark expires on June 30, 2012. *Knowing that this will impact your employee benefit decisions for January 1, 2012* I wanted to personally make you aware of this change." (Emphasis added.)

That was untrue.  Even if the eight defendant Hospital Contracts terminate on June 30, 2012, the run-out clauses of those Contracts provide that Highmark members will continue to have full, interrupted access to all UPMC hospitals and physicians through at least June 2013.  Thus, there is no imminent need for employers to make employee benefit decisions regarding Highmark now.

48.     On June 1, 2011 Mr. Peaslee increased the pressure in a letter to Pittsburgh-area employers stating that "UPMC believes it's *critical* that western Pennsylvania employers and health insurance subscribers begin preparing *now* to ensure they're able to receive the best-in-class health care available at UPMC hospitals."  (Emphasis added.)  Mr. Peaslee's letter further suggested that it will be exceedingly difficult for Highmark members during the one year run-out period, falsely claiming that after June 30, 2012, Highmark will require members to seek approval before visiting a UPMC doctor, and suggesting that Highmark may no longer cover some services and/or that Highmark may make its members personally responsible for financial obligations to UPMC.  UPMC had no basis for these assertions and they are indeed false.  Highmark has repeatedly made clear that if the eight Hospital Contracts terminate on June 30, 2012, under the terms of those contracts, Highmark members will continue to have the same access to Hospital services through June 2013, and that no special permissions or approvals will be required.

49.     These attempts to coerce employers into changing the insurance plans they offer to their employees, and to do so immediately, constitute prohibited efforts by the Hospitals, through their corporate parent UPMC Health System, to solicit or influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in direct violation of their Contracts.

**UPMC's False and Misleading "Keep Your Doctor" Campaign Violates the Lanham Act**

50.     UPMC took its campaign against Highmark to the next level with targeted solicitations of Highmark plan members.  On or around June 21, 2011, UPMC launched the "Keep Your Doctor.  Check Your Plan" advertising campaign.  The campaign plainly targets Highmark members, because they are the only people who would have interest in the UPMC/Highmark contract issues and any potential impact on their ability to continue seeing their UPMC-affiliated doctor.

51.     The core of UPMC's campaign is the website www.keepyourdoc.com.  A copy of the website as it appeared on June 29, 2011 is attached as Exhibit A.

52.     On June 22, 2011, UPMC sponsored full page advertisements in the *Pittsburgh-Post Gazette* and the *Pittsburgh Tribune-Review*, which directed people to the www.keepyourdoc.com website.  This advertisement ran again in the *Pittsburgh-Post Gazette* and the *Pittsburgh Tribune-Review* on June 26 and 29, 2011, and on July 3, 2011.  A copy of the advertisement is attached as Exhibit B.  The advertisement also ran in other area newspapers, including in the *Valley News Dispatch* on June 24 and 29, 2011, in the *McKeesport Daily News* on June 24 and 29, 2011, and in the *Sewickley Herald* on June 30, 2011.

53.     UPMC's campaign also includes radio spots that play on Pittsburgh-area radio stations.  For example, an advertisement that ran on station Y108 FM on July 3, 2011 told listeners "[i]n order to keep seeing your current UPMC doctor, ask your employer to include one of the five health insurers that provide access to UPMC during open enrollment, " and directed people to the www.keepyourdoc.com website.  Between July 1 and July 6, 2011, the radio advertisement ran on both AM and FM radio stations more than 100 times.

54.     Beginning on or around June 21, 2011, executives at the Hospitals issued directives to their medical staff to distribute information to their Highmark plan member patients about the Keep Your Doctor campaign and about the www.keepyoudoc.com website.

55.     For example, on June 21, 2011, John Innoceti, Presbyterian's President, sent an email to all of the members of the Presbyterian medical staff that attached the "Keep Your Doctor. Check Your Plan" advertisement, a "Dear Valued Patient" form letter and a "Q&A flier," all of which directed patients to the www.keepyourdoc.com website.   Mr. Innoceti directed his medical staff to distribute these materials to patients who are Highmark plan members.

56.     Similarly, on June 23, 2011, John Malone, President and CEO of Hamot, sent an email and memorandum to the Hamot Board of Corporators that attached the Keep Your Doctor advertisement and an "information sheet" for patients and consumers.

57.     On July 1, 2011, Mr. Peaslee sent another letter to many of the same Pittsburgh-area employers that he targeted with his June 1 letter (described in paragraph 48 above) again trying to get them to change their insurance carriers and stop using Highmark.  Mr. Peaslee told the employers that "[a]s [they] meet with [their] broker or otherwise make [their] decisions about [their] group's coverage," he wanted to be sure that they knew that only five health insurers "offer continued access to UPMC physicians and hospitals" and that he "believe[s their] employees will want that access and will be grateful to their employer if they are given that choice."  Mr. Peaslee attached a copy of another  "Keep Your Doctor" advertisement to his letter, as well as a copy of an "information sheet" similar to the one Hamot distributed.  The ad that he attached encouraged employers to stop using Highmark immediately, stating: "*Right now is the time for you to make a huge difference.*"  (Emphasis added.)

58.     UPMC's multifaceted "Keep Your Doctor. Check Your Plan" campaign is designed to instill fear in the minds of Highmark plan members that they are in imminent danger of losing access to UPMC providers, and to encourage those individuals to sign up with other insurance plans and/or petition their employers to select plan options other than Highmark as soon as possible.  For example, the website Q&A states:

> **Q. Can I keep my UPMC doctor?**
> A. Check with your employer to ensure it will offer a plan that provides in-network access to UPMC physicians and facilities, such as Aetna, CIGNA, HealthAmerica, United Healthcare, or UPMC Health Plan.

59.     UPMC's campaign is materially false and misleading in that the unavoidable conclusion from the advertising is that there is no current relationship between Highmark and UPMC and/or that the end of the relationship is imminent.

60.     For example, the keepyourdoc.com website states: "This group of health insurance companies is proud to provide access to UPMC," and lists only Aetna, CIGNA, HealthAmerica, UnitedHealthCare and UPMC Health Plan, with links to each company's website.  The keepyourdoc.com site does not mention Highmark even though Highmark also currently provides full access to UPMC hospitals and physicians, and will continue to do so for at least two more years even if the Contracts terminate in 2012.

61.     Similarly, the "Dear Valued Patient" letter that Presbyterian directed its medical staff to provide to patients states that "after June 30, 2012, some of UPMC's hospitals and many UPMC physicians no longer will be in the Highmark or Blue Cross/Blue Shield network."  But this deliberately ignores the run-out period which extends through June 2013, even if the eight Contracts terminate in 2012, and is therefore false.

62.     UPMC's campaign is also false and misleading in that it leads to the unavoidable conclusion that all UPMC hospitals and physicians have terminated their relationships with Highmark.  For example, UPMC is advising Highmark plan members that, as of June 30, 2012: "Five major health insurance plans in western Pennsylvania — UPMC Health Plan, Aetna, CIGNA, HealthAmerica, and United Healthcare — will ensure access to and continuation of care through all UPMC physicians and hospitals.  Of the major insurance plans, only Highmark's will be out of network."  But Highmark will not be "out of network" for payment purposes as of June 30, 2012 under any circumstances; the run-out clauses for eight of the Contracts guarantee full network access through June 30, 2013.  And even if UPMC elected not to renew the remaining three Hospitals' Contracts when eligible to do so, at minimum, Highmark members will continue to have full network access to Hamot Hospital through at least June 30, 2014, to Mercy Hospital until at least June 30, 2016 and to Children's Hospital of Pittsburgh until at least June 30, 2022. In addition, all physician contracts remain in full effect; Highmark has not received any notices of termination for any of those contracts.

63.     UPMC's campaign falsely and misleadingly states that it "intends" to terminate some unspecified number of its physician contracts with Highmark (as distinguished from the Hospitals Contracts) as of June 2012.  For example, Hamot is telling Highmark members that:

> The Highmark contracts governing the services of physicians employed by UPMC, as distinguished from contracts governing UPMC hospitals, are generally terminable on 60 days' notice. UPMC intends to terminate *most* of those contracts simultaneously with the expiration of the hospital contracts on June 30, 2012. (Emphasis added).

This is an empty threat that UPMC cannot practically execute, and on which UPMC has no intention of executing because it would have no effect for the vast majority of Highmark members until at least June 2013.  The Contracts require the defendant Hospitals to continue to

provide Highmark members with access to hospital and physician services at agreed upon rates through the run-out period, with no balance billing to the member, except applicable cost sharing.  Thus, even if UPMC terminated its physician contracts in June 2012, there would be no practical consequences for Highmark members prior to at least June 2013.  The sole purpose of UPMC's intentional deception is to scare Highmark members into believing (falsely) that UPMC might terminate the physician agreements in 2012, and that this might have some consequences for them, so that the members will not enroll in Highmark plans next year.

64.     Of course if UPMC really were intending to follow through on its threat to cancel physician contracts in June 2012, it would have an even larger problem because its campaign statements about Medicare would be completely false.  The keepyourdoc.com website states that "If you are participating in a Medicare or Medicaid plan, you will not be affected by the changes."  One of the largest physician contracts that UPMC has with Highmark covers most commercial and all Medicare Advantage plans in the same contract.  Thus, if UPMC followed through on its threat to terminate physician contracts as of June 2012, it would be terminating Highmark Medicare Advantage members' access to UPMC physician groups so Medicare Advantage members (*i.e.,* participants in a Medicare plan) would be impacted.  Either way, UPMC's statements are false and misleading; its statements that it intends to terminate physician contracts and its protestations that its action will have no effect on Medicare Advantage patients cannot both be true.

**UPMC's "Keep Your Doctor" Campaign Also Violates The Non-Solicitation Clauses**

65.     Even if the Keep Your Doctor campaign were truthful, rather than false and misleading, it would still constitute targeted solicitation of Highmark members in breach of the Contracts' Non-Solicitation Clauses.  By participating in the campaign, each of the Hospitals has

directly through its own conduct, and indirectly through UPMC Health System, solicited, influenced, and attempted to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan.

66.     The www.keepyourdoc.com website, the "Dear Valued Patient" form letters, Q&A fliers, and the "information sheets" that the Hospitals have directed their medical staff to distribute to patients, and the letters that UPMC Health System is sending to area employers, constitute an impermissible targeted solicitation of Highmark plan members.

67.     The campaign is indisputably targeted.  By its very nature, all of this information is directed at patients potentially affected by the possible changes in some of the contractual relationships between Highmark and the Hospitals.  That means Highmark plan members.  No one else would logically be concerned about losing access to their doctors by virtue of any change in the Highmark/UPMC relationship.

68.     The campaign also plainly seeks to scare consumers away from Highmark.  The obvious purpose of the campaign is to encourage Highmark plan members to petition their employers to stop offering Highmark health plans, so employees can enroll in a different plan and "keep [their UPMC] doctor."

69.     The radio advertisements explicitly direct members to take action immediately, stating "in order to keep seeing your current UPMC doctor, ask your employer to include one of the five health insurers that provide access to UPMC during open enrollment."

70.     Similarly, Presbyterian's "Dear Valued Patient" letter and its attached Q&A aggressively encourage patients with Highmark insurance to do whatever they can to disenroll from Highmark and enroll in another plan, or risk losing access to (or paying substantially more for) their current doctor.  The letter tells patients that they "will not be affected" if they enroll in

UPMC Health Plan, Aetna, CIGNA, HealthAmerica or UnitedHealthcare.  And the Q&A encourages patients to "[b]e sure [to] select" one of these plans.

71.    The www.keepyourdoc.com website likewise encourages patients to petition their employers to make sure that the employer will be offering a health plan from one of these other insurers:

> **Q. Can I keep my UPMC doctor?**
> **A.** Check with your employer to ensure it will offer a plan that provides in-network access to UPMC physicians and facilities, such as Aetna, CIGNA, HealthAmerica, United Healthcare, or UPMC Health Plan.

72.    The campaign also seeks to instigate immediate action by Highmark plan members, falsely claiming there will be dramatic changes in their access to UPMC doctors and/or their cost of services from those doctors as of June 2012.

73.    For example, the "Dear Valued Patient" form letter states that care provided at UPMC facilities could be billed at "more costly out-of-network rates" immediately after June 2012.  Similarly, the "information sheet" distributed to Highmark members states that as of June 30, 2012, "Highmark Commercial Members may be required to obtain Highmark's approval to use nonparticipating UPMC hospitals, in addition to obtaining required authorizations of medical necessity from Highmark for certain designated services," and advises patients that they "will need to consider and clarify their personal financial responsibility for care at UPMC facilities and by UPMC caregivers."  This is false and misleading: Highmark has already committed that its members will continue to have the same access to UPMC hospital services through June 2013, with no special permissions or approvals required; and because the Hospitals are required to accept the contract rates through June 2013, Highmark members will continue to have access

to those agreed-upon rates until June 2013.  UPMC claims otherwise in their campaign in a clear attempt to drive Highmark's plan members away from it.

## IRREPARABLE HARM

74.    UPMC's unlawful conduct, if not promptly enjoined, will cause immediate and irreparable harm to Highmark.  Damages alone would not provide an adequate remedy for Highmark and would not remedy UPMC's effort to prevent employers and health plan consumers from selecting health coverage based on accurate information.

75.    Damages would not fully compensate Highmark for its lost business opportunities resulting from UPMC's unlawful conduct.  Further, UPMC's unlawful conduct will injure Highmark's good will and reputation with employers and health plan consumers.

76.    The Contracts recognize this, and provide that "[t]he parties acknowledge that a breach of [the Non-Solicitation Clauses] will result in irreparable injury to [Highmark] for which damages would be inadequate," and that injunctive relief is appropriate to stop and prevent such violations.

## COUNT I – Against Passavant
### Breach of Contract

77.    Highmark repeats and realleges each and every allegation of this complaint.

78.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Passavant (the "Passavant Agreements").

79.    Both of the Passavant Agreements contain the following provision:

> The parties agree that [Passavant] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.  However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in

parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [Passavant] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan. General advertising shall not violate this provision. Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate. In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

Passavant Hospital Agreement at 7, Part I, Section D; Passavant Managed Care Agreement at 7-8, Part I, Section F (the "Passavant Non-Solicitation Clauses").

80.     The parties entered into certain amendments to the original Passavant Agreements; however, none of those amendments altered the Passavant Non-Solicitation Clauses, which remain in effect today, and, by their terms, will continue in effect for one year after the Passavant Agreements terminate.

81.     Passavant has breached and continues to breach the Passavant Non-Solicitation Clauses in the Passavant Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

82.     Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group. Therefore Passavant is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute Passavant's indirect efforts to violate the Passavant Non-Solicitation Clauses.

83.     Highmark performed its obligations under the Agreement at all times before Passavant's breach.

84.     As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

### COUNT II – Against Magee-Womens Hospital
### Breach of Contract

85.     Highmark repeats and realleges each and every allegation of this complaint.

86.     On or around November 1, 2006, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Magee-Womens Hospital (the "Magee Agreements").

87.     Both of the Magee Agreements contain the following provision:

> The parties agree that [Magee] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.  However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [Magee] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.   General advertising shall not violate this provision.  Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.  In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

Magee Hospital Agreement at 6, Part I, Section D; Magee Managed Care Agreement at 7, Part I, Section F (the "Magee Non-Solicitation Clauses").

88.     The parties entered into certain amendments to the original Magee Agreements; however, none of those amendments altered the Magee Non-Solicitation Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the Magee Agreements terminate.

89.     Magee-Womens Hospital has breached and continues to breach the Non-Solicitation Clauses in the Magee Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

90.     Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore Magee is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute Magee's indirect efforts to violate the Magee Non-Solicitation Clauses.

91.     Highmark performed its obligations under the Agreement at all times before Magee-Womens Hospital's breach.

92.     As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

## COUNT III – Against Presbyterian
### Breach of Contract

93.     Highmark repeats and realleges each and every allegation of this complaint.

94.     On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Presbyterian (the "Presbyterian Agreements").

95.     Both of the Presbyterian Agreements contain the following provision:

> The parties agree that [Presbyterian] may, independent hereof, (i)
> own or operate its own health plan, and (ii) participate in health
> plans or programs offered by others.    However, except for
> marketing and promotional efforts directed toward the general
> public with respect to the programs and networks described in
> parts (i) and (ii) of the preceding sentence, during the Term of this
> Agreement and for one (1) year after termination, [Presbyterian]
> shall not, without the prior written consent of [Highmark and
> Keystone], directly or indirectly solicit, influence, or attempt to
> influence any [Highmark or Keystone] Member (i) to disenroll
> from coverage, or (ii) to participate in or subscribe to another
> health plan.   General advertising shall not violate this provision.
> Targeted advertising or solicitation based on identification of
> [Highmark or Keystone] Members or other [Highmark or
> Keystone] beneficiaries shall violate this provision. The parties
> acknowledge that a breach of this paragraph will result in
> irreparable injury to [Highmark and/or Keystone] for which
> damages would be inadequate.   In the event of any breach or
> threatened breach, [Highmark and Keystone] shall be entitled to
> have an injunction issued by a court of competent jurisdiction
> enjoining and restraining the breach or threatened breach and shall
> be entitled to any and all other available remedies.

Presbyterian Hospital Agreement at 7, Part I, Section D; Presbyterian Managed Care Agreement

at 7-8, Part I, Section F (the "Presbyterian Non-Solicitation Clauses").

96.     The parties entered into certain amendments to the original Presbyterian

Agreements; however, none of those amendments altered the Presbyterian Non-Solicitation

Clauses, which remains in effect today, and, by their terms, will continue in effect for one year

after the Presbyterian Agreements.

97.     Presbyterian has breached and continues to breach the Non-Solicitation Clauses in

the Presbyterian Agreements by directly and indirectly soliciting, influencing, or attempting to

influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or

subscribe to another health plan, in the manner described above.

98.     Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore Presbyterian is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute Presbyterian's indirect efforts to violate the Presbyterian Non-Solicitation Clauses.

99.     Highmark performed its obligations under the Agreement at all times before Presbyterian's breach.

100.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

## COUNT IV – Against Northwest
### Breach of Contract

101.    Highmark repeats and realleges each and every allegation of this complaint.

102.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Northwest (the "Northwest Agreements").

103.    Both of the Northwest Agreements contain the following provision:

> The parties agree that [Northwest] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.   However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [Northwest] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.   General advertising shall not violate this provision. Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties

> acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.  In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

Northwest Hospital Agreement at 7, Part I, Section D; Northwest Managed Care Agreement at 7-8, Part I, Section F (the "Northwest Non-Solicitation Clauses").

104.    The parties entered into certain amendments to the original Northwest Agreements; however, none of those amendments altered the Northwest Non-Solicitation Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the Northwest Agreements terminate.

105.    Northwest has breached and continues to breach the Non-Solicitation Clauses in the Northwest Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

106.    Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore Northwest is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute Northwest's indirect efforts to violate the Northwest Non-Solicitation Clauses.

107.    Highmark performed its obligations under the Agreement at all times before Northwest's breach.

108.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

## COUNT V – Against St. Margaret
**Breach of Contract**

109.    Highmark repeats and realleges each and every allegation of this complaint.

110.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and St. Margaret (the "St. Margaret Agreements").

111.    Both of the St. Margaret Agreements contain the following provision:

> The parties agree that [St. Margaret] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.  However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [St. Margaret] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.  General advertising shall not violate this provision. Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.  In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

St. Margaret Hospital Agreement at 7, Part I, Section D; St. Margaret Managed Care Agreement at 7-8, Part I, Section F (the "St. Margaret Non-Solicitation Clauses").

112.    The parties entered into certain amendments to the original St. Margaret Agreements; however, none of those amendments altered the St. Margaret Non-Solicitation

Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the St. Margaret Agreements terminate.

113.    St. Margaret has breached and continues to breach the Non-Solicitation Clauses in the St. Margaret Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

114.    Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore St. Margaret is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute St. Margaret's indirect efforts to violate the St. Margaret Non-Solicitation Clauses.

115.    Highmark performed its obligations under the Agreement at all times before St. Margaret's breach.

116.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

## COUNT VI – Against Horizon
### Breach of Contract

117.    Highmark repeats and realleges each and every allegation of this complaint.

118.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Horizon (the "Horizon Agreements").

119.    Both of the Horizon Agreements contain the following provision:

> The parties agree that [Horizon] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.  However, except for marketing and

promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [Horizon] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.    General advertising shall not violate this provision.  Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.  In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

Horizon Hospital Agreement at 7, Part I, Section D; Horizon Managed Care Agreement at 8, Part I, Section F (the "Horizon Non-Solicitation Clauses").

120.    The parties entered into certain amendments to the original Horizon Agreements; however, none of those amendments altered the Horizon Non-Solicitation Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the Horizon Agreements terminate.

121.    Horizon has breached and continues to breach the Non-Solicitation Clauses in the Horizon Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

122.    Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore Horizon is liable under the Agreements for the actions

of UPMC Health System and the other Hospitals to the extent they constitute Horizon's indirect efforts to violate the Horizon Non-Solicitation Clauses.

123.    Highmark performed its obligations under the Agreement at all times before Horizon's breach.

124.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

### COUNT VII – Against Bedford
### Breach of Contract

125.    Highmark repeats and realleges each and every allegation of this complaint.

126.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and Bedford (the "Bedford Agreements").

127.    Both of the Bedford Agreements contain the following provision:

> The parties agree that [Bedford] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.  However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [Bedford] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.  General advertising shall not violate this provision.  Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.  In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

Bedford Hospital Agreement at 7, Part I, Section D; Bedford Managed Care Agreement at 7-8, Part I, Section F (the "Bedford Non-Solicitation Clauses").

128.    The parties entered into certain amendments to the original Bedford Agreements; however, none of those amendments altered the Bedford Non-Solicitation Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the Bedford Agreements terminate.

129.    Bedford has breached and continues to breach the Non-Solicitation Clauses in the Bedford Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

130.    Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore Bedford is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute Bedford's indirect efforts to violate the Bedford Non-Solicitation Clauses.

131.    Highmark performed its obligations under the Agreement at all times before Bedford's breach.

132.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

## COUNT VIII – Against McKeesport
**Breach of Contract**

133.    Highmark repeats and realleges each and every allegation of this complaint.

134.    On or around June 28, 2002, Highmark and Keystone entered into a binding Hospital Agreement and a binding Managed Care Hospital Agreement with UPMC Health System and McKeesport (the "McKeesport Agreements").

135.    Both of the McKeesport Agreements contain the following provision:

> The parties agree that [McKeesport] may, independent hereof, (i) own or operate its own health plan, and (ii) participate in health plans or programs offered by others.   However, except for marketing and promotional efforts directed toward the general public with respect to the programs and networks described in parts (i) and (ii) of the preceding sentence, during the Term of this Agreement and for one (1) year after termination, [McKeesport] shall not, without the prior written consent of [Highmark and Keystone], directly or indirectly solicit, influence, or attempt to influence any [Highmark or Keystone] Member (i) to disenroll from coverage, or (ii) to participate in or subscribe to another health plan.   General advertising shall not violate this provision. Targeted advertising or solicitation based on identification of [Highmark or Keystone] Members or other [Highmark or Keystone] beneficiaries shall violate this provision. The parties acknowledge that a breach of this paragraph will result in irreparable injury to [Highmark and/or Keystone] for which damages would be inadequate.   In the event of any breach or threatened breach, [Highmark and Keystone] shall be entitled to have an injunction issued by a court of competent jurisdiction enjoining and restraining the breach or threatened breach and shall be entitled to any and all other available remedies.

McKeesport Hospital Agreement at 7, Part I, Section D; McKeesport Managed Care Agreement at 7-8, Part I, Section F (the "McKeesport Non-Solicitation Clauses").

136.    The parties entered into certain amendments to the original McKeesport Agreements; however, none of those amendments altered the McKeesport Non-Solicitation

Clauses, which remains in effect today, and, by their terms, will continue in effect for one year after the McKeesport Agreements terminate.

137.    McKeesport has breached and continues to breach the Non-Solicitation Clauses in the McKeesport Agreements by directly and indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, in the manner described above.

138.    Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore McKeesport is liable under the Agreements for the actions of UPMC Health System and the other Hospitals to the extent they constitute McKeesport's indirect efforts to violate the McKeesport Non-Solicitation Clauses.

139.    Highmark performed its obligations under the Agreement at all times before McKeesport's breach.

140.    As a direct and proximate result of these breaches, Highmark has suffered damage and will continue to suffer ongoing damages as a result of the continuing breach.

### COUNT IX – Against UPMC Health System
### Tortious Interference with Contract

141.    Highmark repeats and realleges each and every allegation of this complaint.

142.    Highmark has existing binding Contracts with each of the Hospitals as described above.  None of those Contracts is terminable at will, and each of those Contracts contains a Non-Solicitation Clause, as described above.

143.    UPMC Health System had knowledge of each of the Hospital's Contracts and their terms.

144.    UPMC Health System deliberately and intentionally acted to cause the Hospitals to breach the Non-Solicitation Clauses in their Contracts.

145.    UPMC Health System directed and/or induced the Hospitals to breach their contract obligations by, among other things, directing them to distribute or cause to be distributed false and misleading information to Highmark members, as described above.

146.    UPMC Health System intended to harm Highmark by interfering in its contractual relationships with the Hospitals.

147.    UPMC Health System has no privilege or valid justification for its interference with Highmark's contractual relationship with the Hospitals.

148.    As a direct and proximate result of UPMC Health System's conduct, Highmark has suffered damage and will continue to suffer ongoing damages.

149.    UPMC Health System's tortious conduct justifies the imposition of punitive damages because it acted willfully, maliciously, purposefully, outrageously, with a bad motive and/or with a reckless indifference to the interests of others.

## COUNT X – Against All Named Defendants
### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

150.    Highmark repeats and realleges each and every allegation of this complaint.

151.    UPMC has, in commercial advertising and promotion in interstate commerce, deceived and misled current and prospective Highmark plan members to believe that there is no current relationship between Highmark and UPMC and/or that the end of the relationship is imminent, when in fact Highmark is today a full service plan for all UPMC providers and will remain so until at least June 2013.  Such representations constitute a false and misleading characterization of the nature, qualities and characteristics of Highmark's products and/or commercial activities in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

152.   UPMC has, in commercial advertising and promotion in interstate commerce, deceived and misled current and prospective Highmark plan members to believe that UPMC has terminated all of its hospital and physician contracts with Highmark, when, in fact, UPMC has only terminated contracts for 8 of 11 hospitals, and has not terminated any physician contracts. Such representations constitute a false and misleading characterization of the nature, qualities and characteristics of Highmark's products and/or commercial activities in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

153.   Because the Hospitals and UPMC Health System share a unity of interest and purpose, their individual actions as described above are on behalf of and for the benefit of each other and the collective group.  Therefore each entity is liable for the actions of the rest of the group.

154.   UPMC intended to confuse and deceive current and prospective Highmark plan members into believing that that there is no current relationship between Highmark and UPMC and/or that the end of the relationship is imminent, and that UPMC has terminated all of its hospital and physician contracts with Highmark.

155.   Highmark current and prospective plan members have been and/or are likely to be confused and deceived into believing that that there is no current relationship between Highmark and UPMC and/or that the end of the relationship is imminent, and that UPMC has terminated all of its hospital and physician contracts with Highmark, as result of UPMC's false and misleading representations.

156.   UPMC's false and misleading statements have deceived and/or are likely to deceive a substantial segment of their intended audience.

157.    UPMC's false and misleading activities are material and have influenced and/or are likely to influence current and prospective Highmark plan members' decisions regarding their health plan enrollment.

158.    Consistent with the decision of the United States Court of Appeals for the Third Circuit in *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160 (3d Cir. 2001), UPMC's advertising activities challenged in this complaint were within the flow of and substantially affected interstate commerce, including, among other things, the following:

> a.    During the relevant period, UPMC's advertising campaign appeared in hard copy versions of newspapers, including the *Pittsburgh Post–Gazette* and *Pittsburgh Tribune-Review*, that are distributed interstate and, therefore, the advertisements appeared outside Pennsylvania.

> b.    During the relevant period, UPMC distributed its advertising campaign through radio broadcasts that are available to and can be accessed by non-Pennsylvania residents.

> c.    During the relevant period, UPMC's advertising campaign also appeared on websites, including "keepyourdoc.com", that are available to and can be accessed by non-Pennsylvania residents.

> d.    UPMC's advertising campaign may have an impact on parties outside of Pennsylvania, including but not limited to the other insurance companies named in the advertising, Aetna, CIGNA, HealthAmerica, and UnitedHealthCare, who reside outside of Pennsylvania.

> e.    The Highmark health plans and the health plans referred to in UPMC's advertisements, including Aetna, CIGNA, HealthAmerica, UnitedHealthCare and UPMC Health Plan, offer services to members who need emergency care while travelling outside of Pennsylvania.

> f.    The Highmark health plans and the other plans referenced in defendant's advertising (Aetna, CIGNA, HealthAmerica, UnitedHealthCare and UPMC Health Plan) provide coverage to beneficiaries who may be out of state residents, such as subscribers' who live in another state, and commute to Pennsylvania for work, or subscribers who have dependants who

reside in another state (*e.g.*, a student attending an out of state college).

g.      If a subscriber of the Highmark plans and the other plans referenced in UPMC's advertising (Aetna, CIGNA, HealthAmerica, UnitedHealthCare and UPMC Health Plan) is in need of a medical service that is not available at a local hospital, that subscriber may be referred to a hospital or medical facility outside of Pennsylvania.

159.    As a direct and proximate result of UPMC's unlawful conduct, the goodwill associated with Highmark and its products has been and/or is likely to be diminished, for which there is no adequate remedy at law.

160.    As a direct and proximate result of UPMC's unlawful conduct, Highmark has suffered and/or is likely to suffer damages in the form of lost sales in an amount not presently known, and irreparable injury to its business reputation and goodwill.

161.    UPMC's violations of 15 U.S.C. § 1125(a) are intentional and willful, and entitle Highmark to recover damages, including enhanced damages, in an amount to be determined at trial.

162.    UPMC's intentional and willful violations of 15 U.S.C. § 1125(a) entitle Highmark to recover its reasonable attorneys' fees in an amount to be determined at trial.

## <u>RELIEF SOUGHT</u>

WHEREFORE Highmark respectfully requests the following relief:

A.      That UPMC's unlawful conduct be declared, adjudicated and decreed a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

B.      That the defendant Hospitals' unlawful conduct be declared, adjudicated and decreed a violation and breach of the contracts between them and Highmark;

C.      That UPMC Health System's unlawful conduct be declared, adjudicated and decreed unlawful tortious interference with the Hospital Contracts;

D.      That UPMC, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:  (1) directly and/or indirectly soliciting, influencing, or attempting to influence Highmark plan members (i) to disenroll from coverage, and (ii) to participate in or subscribe to another health plan, and (2) making false or misleading statements about Highmark, its products, its business or its relationship with UPMC;

E.      That Highmark recover damages against UPMC, including incidental and consequential damages, in an amount to be determined and multiplied, to the extent provided by law;

F.      That Highmark recover punitive damages against UPMC Health System for its willful, malicious, purposeful and outrageous conduct;

G.      That Highmark be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

H.      That Highmark be awarded such additional relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Highmark demands a trial by jury on all issues triable by jury.

Dated: July 13, 2011                      Respectfully submitted,

                                          s/ E. J. Strassburger
                                          E. J. Strassburger
                                          PA10231
                                          STRASSBURGER McKENNA
                                          GUTNICK & GEFSKY
                                          444 Liberty Avenue
                                          Pittsburgh, PA  15222
                                          Telephone:  (412) 281-4323
                                          Facsimile:  (412) 281-8264
                                          Email:  ejstrass@smgglaw.com

                                          Margaret M. Zwisler (*pro hac vice* to be filed)
                                          DC245951
                                          Jennifer L. Giordano (*pro hac vice* to be filed)
                                          DC496746
                                          LATHAM & WATKINS LLP
                                          555 Eleventh Street, NW, Suite 1000
                                          Washington, DC  20004
                                          Telephone:  (202) 637-1092
                                          Facsimile:  (202) 637-2201
                                          Email:  Margaret.Zwisler@lw.com
                                          Email:  Jennifer.Giordano@lw.com

                                          Alfred C. Pfeiffer, Jr. (*pro hac vice* to be file)
                                          CA120965
                                          Megan S. Bouchier (*pro hac vice* to be filed)
                                          CA252614
                                          LATHAM & WATKINS LLP
                                          505 Montgomery Street, Suite 2000
                                          San Francisco, CA  94111-6538
                                          Telephone:  (415) 391-0600
                                          Facsimile:  (415) 395-8095
                                          Email:  Al.Pfeiffer@lw.com
                                          Email:  Megan.Bouchier@lw.com

                                          Attorneys for Plaintiffs Highmark Inc. and
                                          Keystone Health Plan West, Inc.

DC/1481167