IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNIE HENDERSHOT, | ) |
| | ) CA NO. |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL RESERVE BANK OF | ) |
| CLEVELAND - - PITTSBURGH | ) |
| BRANCH, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |

## COMPLAINT

### Jurisdiction

1. Plaintiff, Annie Hendershot, invokes this Court's jurisdiction by virtue of 28 U.S.C. § 1331 and Title VII of the Civil Rights Act 42 U.S.C. § 2000e. The Defendant discriminated against Hendershot on the basis of her sex, and created a hostile work environment. The Defendant also retaliated against Hendershot when she complained about her unfair treatment.

### Parties

2. Annie Hendershot is an adult individual residing in the Western District of Pennsylvania.

3. The Defendant, Federal Reserve Bank of Cleveland - - Pittsburgh Branch, is a quasi-governmental entity that provides banking services to individuals in Pittsburgh, Pa. It is also Hendershot's employer.

### Statement of Facts

4. Annie Hendershot is a female individual who has worked for the Federal Reserve Bank since 2002. She started as a security officer, and was eventually promoted

1

to sergeant. She has been a sergeant in charge of the 3-11p.m. shift for eight years.

5. In 2010, several of Hendershot's subordinates engaged in a pattern of hostile conduct directed at her based on her gender. It began with her subordinates refusing to talk to her, and avoiding her. When she questioned some of the officers about what was wrong, she was told they were sworn to secrecy.

6. Their silence actually concealed a scheme being carried out by certain male employees which would lead to Hendershot being falsely accused of sexual harassment of her subordinates. Thus, Hendershot came to learn that her subordinates had falsely accused her of engaging in unwelcome sexual banter. The allegations made against Hendershot were untrue.

7. Hendershot was summoned to the Human Resources office where she was accused of sexual harassment involving conversations she was allegedly involved in on four separate occasions. She was not given any specific dates or times in which these alleged conversations occurred. She was told the conversation occurred over a number of months. More importantly, she was not privy to any of the facts, or the subject matter of the alleged conversations. She could not recall any of the conversations taking place. Thus, she could not defend herself against these allegations which were vague, contained half-truths and were stale.

8. Hendershot was subject to discipline as a result of the allegations. The discipline was imposed in the absence of an adequate investigation. Chief Norbert Kowalski interviewed only select employees, and did not learn all of the facts. Had a proper and thorough investigation taken place, the untruthful nature of the

allegations would have been apparent. The inadequate investigation was due to Hendershot's gender. In other words, the discipline imposed on Hendershot for this situation was excessive, and would not have been invoked in the instance of a male engaging in similar conduct. In fact, the male officers often engage in sexual banter with no consequence what so ever.

9. In June 2010 after the conclusion of the investigation, Hendershot was reassigned to the daylight shift. Her staff was told she was reassigned for retraining. Hendershot was forced at attend training as if she was a new hire, and told she could not participate on any boards or panels for sexual harassment. The officers on the daylight shift were warned that she was coming to that shift, and they were told not to talk to her. After only one month on daylight, Hendershot was returned to the to the afternoon shift.

10. The Corporal who was the catalyst behind the false allegations of sexual harassment lodged against Hendershot was assigned to the position of acting sergeant after she was moved to the daylight shift. He was the least senior Corporal, and should not have been assigned this duty. However, placing him in this role emboldened him, and others to continue to create a hostile work environment for Hendershot.

11. Hendershot also received a write up for the alleged sexual harassment. The discipline Hendershot received was out of line compared to the Defendant's treatment of other instances of purported sexual harassment. Hendershot witnessed many instances of males engaging in inappropriate sexual

conversations. The offensive conduct of males is overlooked, but the Defendant was quick to discipline Hendershot.

12. Hendershot was moved back to the evening shift after speaking with Ken Kennard, Chief Kowalski's superior. In that conversation, Kennard implied tht he was working under the assumption that Hendershot had asked to be moved to the daylight shift. This was not the case. In other words, Kennard joked that Hendershot should not to get used to people doing her work for her, at which point she told him she did not ask for any of this to happen to her. When Hendershot told Chief Kowalski about the conversation she had with Kenndard, Chief Kowalski was visibly upset, to the point of grabbing her arm. He was upset that Hendershot had spoken with Kennard. It was not long after her conversation with Kennard, that Hendershot was moved back to the evening shift.

13. In July 2010 when Hendershot returned to the afternoon shift, the harassment she experienced at the hands of her subordinates worsened. Hendershot's subordinates engaged in a pattern of conduct amounting to sexual harassment by ignoring her, speaking to her in a rude manner when they did speak to her, and otherwise engaging in conduct meant to make her work environment intolerable. Hendershot was not in a position to do anything about this, because she would be accused of retaliation if she took disciplinary steps against her subordinates. Given this "protection" her subordinates felt free to make her life miserable.

14. The officers would hang up the phone on her, slam things while she was around, prevent her from doing callouts, and they would click on the radio so her radio communications would be interrupted. Officers would also talk to her in sarcastic

tones. Hendershot went to both Human Resources and Chief Kowalski to report the behavior of her subordinates, but nothing was done to help her.

15. After she returned to the afternoon shift, Hendershot completed a performance review for one of the corporals. In the review, she suggested he attend training dealing with relationships. He was antagonistic during the review process, and complained about his evaluation. Hendershot was forced to change the evaluation as a result of his complaints. Later when Hendershot was reviewed by Chief Kowalski, she was given an unwarranted below average review. When she complained to Human Resources, her review was not changed.

16. Chief Kowalski did assemble one meeting as an attempt to relieve the tension between Hendershot and her subordinates. He assured her he would facilitate the meeting, and speak to the officers on her behalf. Chief Kowalski did not facilitate the meeting, which got out of control. One corporal was visibly angry. He yelled at Hendershot, and the rest of her subordinates ganged up on her. They spoke in generalities, and Chief Kowalski did nothing to stop the behavior, or change the course of the meeting. There was only one officer who defended Hendershot during the meeting, and he actually complained to Human Resources afterwards because the meeting was so out of control.

17. The Defendants' managers continued to treat Hendershot differently. She was criticized in a review for using the phone and the internet when other employees did the same without criticism. She was told to remain in the control room away from the other officers, and when she complied she was criticized for not working as hard as other supervisors. She was also overlooked for training opportunities.

One corporal commented that maybe if she baked some cookies and brought them in things would get better. The problems Hendershot faced were ongoing, and extremely burdensome. She was constantly apprehensive that some small infraction committed by her would be overblown, while realizing, at the same time that she was effectively stopped from demanding the respect and proper behavior which she should expect from her subordinates.

18. In March 2011, a male sergeant was promoted to lieutenant without any posting of notice or interview process. Hendershot was at least as qualified for the position as the male who was promoted, but was not considered for the position or offered an interview. After he was promoted, he made comments to Hendershot indicating the reason for his promotion was because he never complained to Human Resources or outside agency.

19. Hendershot also faced several frivolous disciplines around this same time period. She was written up for not securing her weapon, which she left in her locker when she left the Bank because she was having an asthma attack. Another time she was written up for securing her weapon in her locker when she left for lunch. Hendershot was also written up for not writing a bank medical after a Social Security ALJ fell outside the Bank, and an Officer on duty gave him a Band-Aid. She was at lunch during this incident, and a male Corporal was in charge. The male Corporal was not disciplined for not writing the report.

20. In July 2011, Hendershot took a leave of absence for two weeks. While she was gone, her desk and locker were cleaned out, and everything was thrown away. No one at the Bank or in Human Resources knows who is responsible for cleaning

out her desk. She lost both personal items, and Bank documents she needs to properly perform her job duties. A filing cabinet that belonged to the officer who defended her at the meeting was also cleaned out. Most officers employed by the Defendants at that time believed the filing cabinet was hers.

21. In August 2001, Hendershot received another negative evaluation criticizing her attitude, and communication with her supervisor. This negative evaluation is unwarranted, and retaliation for her previous complaints.

22. The treatment of Hendershot has been negative and hostile due to her gender. The resentment of her subordinates tied to working for a female has reverberated through the command structure so that now the command structure has adopted the gender bias of the subordinates.

## Count I

## Hostile Work Environment in Violation of Title VII

23. The Defendant violated Title VII of the Civil Rights Act by discriminating against Hendershot on the basis of her gender.

24. The defendants created a hostile work environment for Hendershot by allowing her subordinates to engage in hostile conduct towards her on the basis of her gender. Management knew about the conduct, but did nothing to remedy it. The conduct consisted of ignoring her, being rude and sarcastic, hanging up the phone on her, clicking on the radio so her communications would be interrupted, making inappropriate comments and yelling at her in a meeting. This conduct occurred almost daily for over a year. It was clearly pervasive and regular.

25. Her subordinates were also able to make false accusations of sexual harassment against her for which she was disciplined without an adequate investigation into the truthfulness of the allegations. This resulted in her being moved from her shift for a one-month period for retraining. Most of Hendershot's male subordinates engaged in inappropriate conversations, but were never disciplined.

26. Hendershot was treated differently than males officers, and was passed over for promotions and training opportunities.

27. Hendershot was also unfairly criticized in her performance reviews, and unfairly disciplined as a result of her gender. She was treated differently than male employees at the Bank.

28. The totality of the treatment also resulted in her being overlooked for promotional opportunities. The existence of false discipline in her file precluded promotion. During the time involved in this case, promotional opportunities for which Hendershot possessed the qualifications became available but she was not considered a candidate. The false disciplines will also affect Hendershot's ability to transfer to different branches within the District.

## Count II

### Retaliation in Violation of Title VII

29. The Defendant also violated Title VII of the Civil Rights Act by retaliating against Hendershot for complaining about her unfair treatment, and for filing a complaint with the Pennsylvania Equal Employment Opportunity Commission.

30. Hendershot received several frivolous disciplines after complaining to Human Resources and the Equal Employment Opportunity Commission about her

treatment at the hands of the Defendant. She also received negative performance reviews after protesting her unfair treatment.

31. Hendershot was overlooked for a promotion to lieutenant despite being qualified for the promotion. In fact, the promotional opportunity was never posted, and she was never offered an interview. When Hendershot met with the new lieutenant after he was promoted, he indicated that he got the promotion because he never lodged any complaints against the Bank.

32. During a two-week leave of absence taken by Hendershot, her desk was cleaned out, and her things both personal and work related were thrown away. No one at the Bank can account for these actions.

33. Hendershot was retaliated against for protesting her unfair treatment, and the hostile environment in which she was forced to work.

### Injuries

34. As a result of the conduct described above, Henedershot has experienced anxiety and embarrassment. She is in constant fear of losing her job, and is under extreme stress while at work trying to perform her job duties in the hostile environment. She has lost promotional and training opportunities, and has suffered unfair disciplines and poor performance reviews. She also believes her salary in less in other male sergeants employed by the Bank.

### Relief

35. Hendershot requests this Court assume jurisdiction over this matter and award her all the relief that is just and appropriate.

Respectfully Submitted,

s/ Edward A. Olds
Edward A. Olds, Esquire
Pa. I.D. 23601

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
(412) 492-8975
edolds@earthlink.net
*Counsel for the Plaintiff*